**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Micki Jain, | Case No.: 4:20-cv-3042 |
| Plaintiff, | **ORIGINAL COMPLAINT FOR:**<br>**Wrongful Termination** |
| v. | |
| Caterpillar, Inc. | **JURY TRIAL DEMANDED** |
| Defendant. | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

Plaintiff Micki Jain files this Original Complaint against Caterpillar, Inc. ("Caterpillar" or "Defendant"), and alleges as follows:

## I.    PARTIES

1.      Plaintiff Micki Jain is, and was all relevant times, a citizen of Texas, residing in The Woodlands, Montgomery County, Texas.

2.      Caterpillar, Inc. is a corporation incorporated in Delaware with its principal place of business in Illinois. It can be served via its registered agent for service in Texas, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

## II.    JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendant are citizens of different states and the amount in controversy is over $75,000.

4.      This Court has personal jurisdiction over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts giving rise to Plaintiff's claims occurred within this district.

5.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c) because the Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

6.      Plaintiff is familiar with Defendant's practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## III.    FACTS

### A.    Plaintiff's Work at Caterpillar and Kemper

7.      Plaintiff Micki Jain ("Jain") began working for Caterpillar in 1997. In December 2016 Caterpillar acquired Kemper and Mr. Jain was internally transferred to Kemper with the same salary grade and benefits. His salary was $203,000 per year in 2020. In addition to his salary, he received a average bonus of $76,000 per year, annual stock grants valued at approximately $25,000 per year, 401k contributions of approximately $12,180 per year, and insurance benefits worth approximately $20,000 per year, for a total compensation package of approximately $336,180 per year.

8.      He was a devoted employee, relocating seven times at Kemper or Caterpillar's request. Mr Jain was consistently recognized as a high performing employee. He was recognized with the Presidential Award in 2013, which is awarded to less than one-tenth of one percent of employees. In 2016 and 2017 Mr. Jain earned, and was recognized with, an "exceeds expectations" rating at his annual performance review. In 2018 he was promoted in place based on exceptional performance and included in a video produced by Caterpillar with Tim Hennessy regarding the success of Kemper, which was played for 300 of Caterpillar's top global executives. In 2020, Jain won the largest single mobile service project in Kemper post-acquisition history. In 2020, Jain doubled the number of parts Kemper sold to Calfrac Well

Services Ltd., compared to the 2019 sales.

9.       Despite Jain's excellent performance, Kemper rated him as not meeting expectations in 2019, and put him on an Action Plan for Q1 2020. The Action Plan was a farce, as evidenced by the fact that Tim Hennessey was late to 5 different meetings and canceled the last 3 meetings required by the Action Plan, demonstrating that Kemper had already decided to terminate Jain in retaliation for his protected activity. Kemper terminated Jain on April 15, 2020.

**B.       Kemper's Illegal Acts**

**1.       Misrepresenting Manufacturer and Country of Origin**

10.      Kemper was engaged in routinely misrepresenting the products it sold to customers.

11.      Post-acquisition, Kemper engaged in a regular practice of grinding off the names of manufacturers and/or country of origin from products it sold, and misrepresenting them to customers.

12.      For example, Kemper wanted to hide the fact that it was selling hammer unions manufactured by Bonny Forge, and engaged in a practice of grinding off the "Bonny Forge" stamp from the hammer unions, packing them in "Kemper Valve" boxes, and misrepresenting them to customers as being manufactured by Kemper.

13.      Similarly, Kemper wanted to hide the fact that some components of its Seal-O-Grip Air Grip mud tank unions were manufactured in China by one of Kemper's suppliers, rather than manufactured by Kemper itself. Accordingly, after purchasing the components, Kemper grinded off the Made-In-China stamp, retouched the part with paint to hide its deception, and sold the Seal-O-Grip unions in a Kemper Valve box marked with a USA flag, falsely designating that the part was made in the United States.

14.     Similarly, Kemper assembled a Chinese-made gear-op sub-assembly on a Gear-Op Plug Valve and falsely marketed it as a domestic USA-made part.

15.     Kemper also deceived customers by falsely representing that Italian-made hammer unions were made by Kemper Valve in the United States, by repackaging them in shipping boxes with a USA flag.

16.     This practice was eventually stopped but the sales of these misbranded products continued. Tim Hennessey insisted that Kemper's sales department continue selling all the misbranded products, and continue falsely communicating to customers about the products' identity, and country of origin. Kemper knew that it was selling products with counterfeit marks, falsely identifying the products as manufactured by Kemper in the United States, and making these false communications via interstate mail and wire.

17.     Kemper engaged in this practice because it knew that the products were manufactured by other companies in China (not by Kemper in the United States), but wanted to deceive its customers into believing the products were made by Kemper in the United States.

18.     Kemper was one of the last companies to manufacture flow iron and hammer unions in the United States and knew that its customers were motivated to purchase domestic products. Accordingly, Kemper falsely designated its foreign products as being locally manufactured, despite knowing that it had moved its sources overseas. Kemper made false communications regarding these matters with purchasers over mail and wire.

### 2.     False Designation of Country of Origin, 19 USC § 1304

19.     The country of origin of goods sold in the United States is regulated under 19 USC § 1304, which regulates the marking of imported articles and containers. It requires goods imported into the United States to have the origin of the article truthfully and accurately marked

on the article and the article's container. Violation of this statute is criminally punishable upon conviction for the first violation with fines up to $100,000, and imprisonment of up to 1 year. 19 USC § 1304(l).

### 3.   Use of Counterfeit Marks, 18 USC § 2320

20.   The trafficking in counterfeit goods also is a crime under 18 USC §2320 because the products had a counterfeit mark, the use of which was likely to cause confusion or to deceive buyers regarding the manufacturer of the product.

21.   Violation of this statute subjects the violator to criminal penalties.

### 4.   Wire Fraud and Mail Fraud

22.   Defendant's criminal conduct described above also constituted wire and mail fraud because the illegal transactions were committed via use of interstate telephone calls, emails, and other electronic communication made in furtherance of the scheme to falsely designate the country of origin and to use counterfeit marks.

23.   As described above, Defendant (1) voluntarily and intentionally devised or participated in a scheme to defraud customers out of money; (2) did so with the intent to defraud; (3) reasonably foresaw that interstate wire and/or mail communications would be used; and (4) interstate wire and/or mail communications were in fact used.

24.   Defendant regularly defrauded its customers via interstate wire and mail communications by emailing customers invoices, electronic quotes, and product brochures with these false designations of country of origin, and these counterfeit marks.

25.   Violation of this statute subjects the violator to criminal penalties.

C.     **Defendant Wrongfully Terminated Jain In Violation Of The *Sabine Pilot* Doctrine**

1.     ***Sabine Pilot* Doctrine**

26.     Under *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985), an employee has a claim for wrongful termination when he (1) was asked (implicitly or explicitly) to commit an illegal act carrying criminal penalties; (2) refused to engage in the illegal act; (3) was discharged; and (4) the sole reason for his discharge was the refusal to commit the illegal act.

27.     Tim Hennessey ordered Jain to participate in mail fraud and wire fraud, as described above, with regard to selling mislabeled products to customers. Hennessey insisted that Jain and others in Kemper's sales department sell what Kemper's manufacturing department provided, and that they communicate with customers false information about the manufacturer and country-of-origin. Jain refused to defraud Kemper's customers in this manner and insisted on telling Kemper's customers the truth about the manufacturer and country-of-origin of the products Kemper was selling. Hennessey became very hostile about Jain's refusal to engage in these criminal acts and decided to terminate him.

2.     **Sabine Pilot Damages**

28.     Damages available under *Sabine Pilot* include any recoverable tort damage, *including punitive damages*, as well as lost wages and mental anguish damages. *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 661 (Tex. 2012). Damages also include back pay, front pay, and accrued benefits. *Avery v. Kindred Hosps.*, No. 09-cv-1920-F, 2009 U.S. Dist. LEXIS 148527, at *7 (N.D. Tex. Dec. 10, 2009).

29.     Plaintiff's damages currently exceed $2.1 million.

     **3.**     **Caterpillar retaliated against Jain for Refusing to Engage in Illegal Acts**

30.    Jain was generally recognized by Caterpillar and Kemper as a reliable and productive employee, with the only exception being dissatisfaction with his refusal to go along with Kemper's illegal conduct.

31.    Once Jain began to resist engaging in illegal practices, Kemper's treatment of him changed and Kemper began retaliating against him despite an unblemished and repeatedly recognized record of excellent performance. First the retaliation took the form of subjecting him to a hostile, bullying, intimidating and toxic work environment. It elevated to Kemper giving him an unfair performance review, finding that he failed to meet expectations, and subjecting him to a sham Action Plan. Eventually it elevated to Jain's termination.

32.    Kemper never gave Jain a termination letter or otherwise explained to him the reason for his termination letter. Hennessey never provided him with results of the sham Action Plan, and canceled the final three meetings required by the sham Action Plan. The circumstances surrounding Jain's termination strongly support an inference that Kemper's sole reason for terminating Jain was Jain's refusal to engage in illegal activity. There is no substantiation of any alleged performance issues that would support an alternate cause for Jain's termination.

33.     Mr. Jain was terminated on April 15, 2020.

34.    Since he was terminated, he has applied for dozens of jobs but not received a single offer.

35.    It is an unfortunate but incontrovertible fact that after being fired at age 56, Mr. Jain is unlikely to find employment in a substantially equivalent position again in the near future—if ever.

36.     Mr. Jain planned to continue working until he was age 65.

37.     Mr. Jain suffered extreme emotional distress, mental anguish, and humiliation in an amount to be determined by the jury.

38.     He has a medical disability, and his loss of health insurance when Kemper terminated him has had a serious negative effect on his health status, compounding the stress of being unemployed. Jain experienced extreme emotional distress that impacted him and his family. He was left without income and employment during the height of the Covid-19 pandemic, with historically high unemployment in the United States.

39.     He has experienced stress and depression, leading to blood sugar fluctuation complicating his diabetes, and requiring additional medical attention.

40.     Kemper's wrongful termination of Mr. Jain has negatively affected his professional reputation in the community. Jain has received continuous calls and text messages from Kemper's customers and Kemper's sales staff asking for details of why Jain was suddenly terminated.

## IV.     CAUSES OF ACTION

### Claim 1
### Wrongful Termination - *Sabine Pilot*

41.     Plaintiff re-alleges and incorporates by reference all paragraphs in this pleading.

42.     Defendant's termination of Plaintiff violated Texas common law as enunciated in *Sabine Pilot Services, Inc. v. Hauck*, 687 S.W. 2d 733 (Tex. 1985); and *Johnston v. Delmar Distributing Co.*, 776 S.W. 2d 768 (Tex. App.--Corpus Christi 1989, writ denied). An employer cannot take adverse action against a person for refusing to commit an illegal act.

43.     As described above, Plaintiff was asked (implicitly and/or explicitly) to commit

illegal acts carrying criminal penalties; he refused to engage in the illegal acts; (3) he was discharged; and (4) the sole reason for his discharge was the refusal to commit the illegal acts.

44.     As a direct result, Plaintiff has suffered general and special damages.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1.     As to the *Sabine Pilot* claim, back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, punitive damages, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial; and such other relief as the Court deems just and equitable.

## V.     JURY DEMAND

Plaintiff hereby demands a jury trial on all issues triable to a jury.


Dated:  August 31, 2020.

/s/ Cory S. Fein
Cory S. Fein
Cory Fein Law Firm
712 Main St., Suite 800
Houston, TX  77002
cory@coryfeinlaw.com
(281) 254-7717 (phone)
(530) 748-0601 (fax)


**ATTORNEY FOR PLAINTIFF**

9